# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

MELANIE RUPORT,                    ) 1:04-cv-6065-SMS
                                   )
                Plaintiff,         ) DECISION AND ORDER ON SOCIAL
                                   ) SECURITY COMPLAINT (DOC. 1)
                                   )
        v.                         ) ORDER DIRECTING REMAND PURSUANT
                                   ) TO SENTENCE FOUR of 42 U.S.C. §
JO ANNE B. BARNHART,               ) 405(g)
Commissioner of Social             )
Security,                          ) ORDER DIRECTING THE CLERK TO
                                   ) ENTER JUDGMENT FOR PLAINTIFF
                Defendant.         ) MELANIE RUPORT AND AGAINST
                                   ) DEFENDANT JO ANNE B. BARNHART
_____)

        Plaintiff is represented by counsel and is proceeding in

forma pauperis with an action seeking judicial review of a final

decision of the Commissioner of Social Security (Commissioner)

denying Plaintiff's application for a period of disability,

disability insurance benefits (DIB), and supplemental security

income (SSI) benefits under Titles II and XVI of the Social

Security Act (Act). Pursuant to 28 U.S.C. § 636(c)(1), the

parties have consented to the jurisdiction of the Magistrate

Judge to conduct all proceedings in this matter, including

ordering the entry of final judgment.[1] The matter is currently before the Court on the parties' briefs, which have been submitted without oral argument to the Honorable Sandra M. Snyder, United States Magistrate Judge.

<u>PRIOR PROCEEDINGS</u>

On July 16, 2002, Plaintiff filed a claim for SSI benefits under Title XVI of the Act and an application for DIB benefits under Title II of the Act, respectively, alleging disability beginning on April 20, 1998, due to arthritis, carpal tunnel syndrome, and fibromyalgia. (A.R. at 90-93, 97.) Plaintiff's claim was denied initially and on reconsideration. (<u>Id.</u> at 60-74.) Plaintiff requested a hearing before an administrative law judge (ALJ) of the Social Security Administration (SSA). On March 12, 2004, Plaintiff appeared with an attorney and testified before the ALJ, Patricia Leary Flierl. On April 16, 2004, the ALJ denied Plaintiff's application for benefits. (<u>Id.</u> at 15-21.) Plaintiff appealed the ALJ's decision to the Appeals Council. On June 9, 2004, the Appeals Council denied Plaintiff's request for review. (<u>Id.</u> at 5-7.)

On August 9, 2004, Plaintiff filed the complaint in the instant action. Defendant filed the administrative record on November 30, 2004. On February 17, 2005, Plaintiff filed an opening brief. On April 14, 2005, Defendant filed a brief in opposition. On April 26, 2005, Plaintiff filed a reply brief.

<u>ADMINISTRATIVE FINDINGS</u>

Plaintiff, who was insured through diability through

---

[1] District Judge Oliver W. Wanger ordered the case assigned to the undersigned Magistrate Judge on December 2, 2004.

September 30, 2000, had a severe impairment of carpal tunnel syndrome that did not meet or medically equal a listed impairment; her residual functional capacity (RFC) was to engage in a significant range of light work in that she could lift twenty pounds occasionally, lift and carry ten pounds frequently, stand/walk/sit for six hours in an eight-hour day, but not perform repetitive hand motions. She was unable to perform her past relevant work, but as a younger individual between eighteen and forty-four years of age with more than a high school or equivalent education and no transferable skills, she was able to perform a significant number of jobs in the national economy; thus, she was not disabled.

<u>ISSUES PRESENTED</u>

The following issues are presented for decision:

1) Whether the ALJ's rejection of nurse practitioner Land's opinion regarding Plaintiff's ability to perform work was supported by specific and legitimate reasons;

2) Whether the ALJ's rejection of the opinion of consultative examiner Damania regarding Plaintiff's carpal tunnel limiting her to lifting ten pounds or less was supported by specific and legitimate reasons; and

3) Whether the ALJ erred at step five by relying on the grids and failing to obtain the testimony of a vocational expert (VE) because of Plaintiff's limitation of no repetitive hand motions.

////

3

1

FACTS[2]

2     I. Plaintiff's Testimony

3     Plaintiff, born in 1975 and aged twenty-eight at the time of

4 the hearing, testified that she previously worked as a security

5 guard, leaving that job in 1998 due to hand problems. She stated

6 that she was right-handed and that her left hand was worse than

7 her right; she had worn braces prescribed by Dr. Lazano for about

8 four years (Tr. 38-44). She dropped things and was unable to pick

9 up pennies from a table. (Tr. 45.) She had a vein in her right

10 hand that puffed out when she tried to pick something up and

11 caused pain so intense that she had to hold her hands above her

12 head to get the blood to flow out of her hands. (Tr. 47).

13     Plaintiff testified that she also had chronic bronchitis and

14 fibromyalgia with pain in her joints. (Tr. 43). At her home she

15 took breathing treatments of Albuterol, a nebulizer, four times a

16 day; perfume in a closed space choked her up. (TR. 43). She also

17 used an Asthmacort inhaler as well as Advair, a steroid inhaler.

18 (Tr. 50). She reported that air capacity testing of her lungs

19 done a few days previously were reportedly bad, between 250 and

20 350 on the machine, but she had no record of it. (Tr. 50).

21     Plaintiff testified that she wore gloves because her fingers

22 were sensitive to cold (Tr. 44). She experienced constant pain,

23 numbness, and tingling in her hands. (Tr. 47.) Her breathing

24 medication cause a rapid heartbeat, and Vicodin and Soma she took

25 to be able to sleep made her really groggy and sometimes forget

26 what she was doing. (Tr. 48).

27

28

_____

[2] The summary of the facts is derived from Defendant's summary of the testimony and record.

1    Plaintiff did not drive a car or have a driver's license.
2    (Tr. 40.)

3    Plaintiff testified that the heaviest thing she could carry
4    was a pen, for a short distance only, and she had trouble writing
5    (Tr. 45). She also testified that she could not walk a city block
6    and could stand and sit for ten minutes before having to change
7    positions (Tr. 48).

8    Plaintiff stated that her boyfriend helped her care for her
9    four children, and that her doctor had suggested surgery for her
10   carpal tunnel syndrome (CTS) (Tr. 46). Plaintiff and counsel
11   clarified that her physician found no trigger points for
12   fibromyalgia and that her doctors thought that she just had
13   carpal tunnel (Tr. 49). She testified that she did not go
14   anywhere or do anything. She just stayed home with her kids (Tr.
15   51). She did very little housework, no cooking or grocery
16   shopping, and needed help tying her shoes. (Tr. 51-2).

17   Plaintiff testified that her doctor said that she would
18   provide Plaintiff with a paper so that Plaintiff could have In-
19   Home Supportive Services help with cleaning up; the actual IHSS
20   people told her that unless she was diagnosed as disabled by the
21   state and on Social Security, they would not provide the help.
22   (Tr. 53). The RFC assessment filled out by the nurse practitioner
23   was done for the welfare office; Plaintiff would have to go
24   through GAIN, but the doctor did not think Plaintiff could do it.
25   Plaintiff had been receiving AFDC for almost five years, so it
26   was just about coming to the cut-off point. (Tr. 53-54). Her
27   hands had worsened over the years, but if surgery helped she
28   would try to return to work. (Tr. 54). Glasses corrected her

1 vision except for peripheral vision. (Tr. 56).

2 Plaintiff weighed 300 pounds and was trying to schedule a
3 gastric bypass. (Tr. 51).

4 II. <u>Medical History</u>

5 Progress notes from rheumatology at Community Medical
6 Centers from December 2001 show that injections and Prednisone
7 did not help Plaintiff's CTS. (Tr. 131-32.) Plaintiff received
8 medications for her pain.

9 On March 11, 2002, Cicely Roberts, M.D., interpreted
10 radiological scans taken of Plaintiff's cervical spine. Dr.
11 Roberts opined that the scans showed no abnormality (Tr. 168).

12 On May 31, 2002, Linda Land, a family nurse practitioner
13 (FNP), signed an evaluation of Plaintiff's condition, concluding
14 that she was unable to work, although her condition did not
15 preclude Plaintiff's taking care of her children, and Plaintiff
16 did not need someone in the home to care for her. (Tr. 164-166).
17 She opined that Plaintiff could stand, walk, and sit for zero to
18 two hours at one time, was restricted in using her hands,
19 fingers, and feet for repetitive motions and was further
20 restricted by environmental factors, should never lift ten
21 pounds, and should never climb, balance, stoop, kneel, crouch,
22 crawl or reach (Tr. 165-166). The report is not signed by a
23 doctor.

24 On June 20, 2002, Perminder Bhatia, M.D., interpreted an
25 electromyelogram (EMG) study regarding Plaintiff's neurological
26 status, including her wrists, elbows, and palms. Dr. Bhatia, a
27 Board-certified neurologist, concluded that the nerve studies
28 were "normal" (Tr. 247).

On September 19, 2002, John Kwock, M.D., diagnosed Plaintiff with CTS, compression of the median nerve at the wrist. He noted that the "vast majority of these cases do respond to conservative treatment and will not require any further or more extensive treatment." Dr. Kwock managed Plaintiff's symptoms with anti-inflammatory medications and a splint (Tr. 244).

On December 20, 2002, Rustom F. Damania, M.D., examined and evaluated Plaintiff (Tr. 138-142). Dr. Damania, an internist, diagnosed obesity, bronchial asthma (by history), CTS (subjectively only), positive rheumatoid factor (by history), arthritis (subjectively only) with no deformities or ankylosis, and fibromyalgia (by history) (Tr. 142). Examination revealed full range of motion in the elbows and shoulders with no signs of chronic inflammation. The wrists and wrist joints were non-tender, not swollen, capable of full range of motion, without any deformities, ankylosis, subluxations, or contractures. There were negative Tinel's and Phalen's signs, full flexion, normal power, normal radial and ulnar deviations, and very weak grip but no atrophy of the palmar muscles. Plaintiff's impaired sensation on the tips of both first fingers was atypical for median nerve compression and appeared more in relation to radial and ulnar nerves. Hip joints, knee joints, ankle joints, and cervical spine were normal with normal range of motion. Power was grade 5/5 in both upper and lower extremities. There were no trigger points at any of the usual locations. Dr. Damania noted subjective symptoms of CTS, but stated that her clinical examination was atypical of CTS, and aside from the CTS, there was no other objective evidence for gross physical disability. Dr. Damania recommended

nerve conduction studies to confirm the CTS diagnosis.

Dr. Damania concluded that Plaintiff would have no difficulty sitting, standing, or walking in an eight hour work day with normal breaks; there were no exertional limitations, but if findings on the nerve conduction studies confirmed CTS, then Plaintiff would be restricted to holding or lifting objects weighing ten pounds or less. Dr. Damania opined that Plaintiff would have no postural, manipulative, communicative, or visual limitations, but Plaintiff might have difficulty with small objects, such as tools (Tr. 142).

On December 20, 2002, Shireen R. Damania conducted a psychiatric evaluation of Plaintiff (Tr. 143-146). Dr. Damania, Board-certified in psychiatry, stated that there was no evidence of any emotional deterioration, and no emotional impairment affected Plaintiff's ability to work. Plaintiff had no difficulties in interpersonal and social skills, memory, concentration, persistence, or pace and could understand and carry out complex job instructions. (Tr. 146).

A state medical consultant's psychiatric review technique concluded that there was no medically determinable impairment in January 2003. (Tr. 183.)

Plaintiff's treating physician diagnosed fibromyalgia/arthralgia, prescribed Vicodin, and referred Plaintiff to pain management in October 2003. (Tr. 220-21, 225, 233, 216.)

On January 14, 2003, Ernest Wong, M.D., a state medical consultant, evaluated Plaintiff based on his review of Plaintiff's medical history (184-190). Dr. Wong noted Plaintiff's

8

history of CTS, asthma, obesity, and fibromyalgia. He concluded
that Plaintiff could lift twenty pounds occasionally and ten
pounds frequently; stand, walk and sit for about six hours in an
eight-hour workday without any postural limitations; was limited
to occasional forceful or prolonged handling and to occasional
feeling, but could do frequent bilateral upper extremity basic
handling; and should avoid concentrated exposure to fumes, odors,
dusts, gases, poor ventilation, etc. (Tr. 185-188).

In April 2003, Dr. Wong's findings were confirmed by state
medical consultant Alfred Torre, M.D. (Tr. 190).

On January 27, 2004, Susan Barrows, M.D., interpreted MRI
scans of Plaintiff's right wrist. She found some minimal fluid in
the dorsal tendon sheath, but the carpal tunnel itself was
unremarkable, with no abnormal flattening or increased signal
intesity in the median nerve. Dr. Barrows diagnosed mild
tenosynovitis, but noted "no specific constrictions of the medial
nerve or carpal tunnel" (Tr. 250-251).

On March 9, 2004, Eric Raymond, M.D., interpreted an MRI
scan taken on February 26, 2004, of Plaintiff's left wrist. Dr.
Raymond found some minimal fluid in the tendon sheath, which
might suggest tenosynovitis; and there was slight flattening of
the median nerve with increased signal intensity on the fluid
sensitive sequences, which most likely represented CTS, and he
stated that there were "findings suggesting carpal tunnel
syndrome" (Tr. 248-249).

In 2003, Plaintiff was evaluated for CTS surgery. (TR. 224.)
In the Spring of 2004, Plaintiff was evaluated for gastric
bypass, which she desired. (Tr. 199-202.) By February 2004,

9

Plaintiff contemplated surgery for her CTS. (Tr. 203.)

## SCOPE AND STANDARD OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance, Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. The Court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion; it may not simply isolate a portion of evidence that supports the decision. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the determination of the Commissioner as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, and not the Court's, to resolve conflicts in the evidence. Sorenson v. Weinberger, 514 F.2d 1112, 1119 (9th Cir. 1975).

In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must review the whole record and uphold the Commissioner's

determination that the claimant is not disabled if the Secretary
applied the proper legal standards, and if the Commissioner's
findings are supported by substantial evidence. See, Sanchez v.
Secretary of Health and Human Services, 812 F.2d 509, 510 (9th
Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If the Court
concludes that the ALJ did not use the proper legal standard, the
matter will be remanded to permit application of the appropriate
standard. Cooper v. Bowen, 885 F.2d 557, 561 (9th Cir. 1987).

ANALYSIS

     I. Disability

     In order to qualify for benefits, a claimant must establish
that she is unable to engage in substantial gainful activity due
to a medically determinable physical or mental impairment which
has lasted or can be expected to last for a continuous period of
not less than twelve months. 42 U.S.C. §§ 416(i), 1382c(a)(3)(A).
A claimant must demonstrate a physical or mental impairment of
such severity that the claimant is not only unable to do the
claimant's previous work, but cannot, considering age, education,
and work experience, engage in any other kind of substantial
gainful work which exists in the national economy. 42 U.S.C.
1382c(a)(3)(B); Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th
Cir. 1989). The burden of establishing a disability is initially
on the claimant, who must prove that the claimant is unable to
return to his or her former type of work; the burden then shifts
to the Commissioner to identify other jobs that the claimant is
capable of performing considering the claimant's residual
functional capacity, as well as her age, education and last
fifteen years of work experience. Terry v. Sullivan, 903 F.2d

11

1273, 1275 (9ᵗʰ Cir. 1990).

   The regulations provide that the ALJ must make specific sequential determinations in the process of evaluating a disability: 1) whether the applicant engaged in substantial gainful activity since the alleged date of the onset of the impairment, 20 C.F.R. § 404.1520 (1997);[3] 2) whether solely on the basis of the medical evidence the claimed impairment is severe, that is, of a magnitude sufficient to limit significantly the individual's physical or mental ability to do basic work activities, 20 C.F.R. § 404.1520(c); 3) whether solely on the basis of medical evidence the impairment equals or exceeds in severity certain impairments described in Appendix I of the regulations, 20 C.F.R. § 404.1520(d); 4) whether the applicant has sufficient residual functional capacity, defined as what an individual can still do despite limitations, to perform the applicant's past work, 20 C.F.R. §§ 404.1520(e), 404.1545(a); and 5) whether on the basis of the applicant's age, education, work experience, and residual functional capacity, the applicant can perform any other gainful and substantial work within the economy, 20 C.F.R. § 404.1520(f).

   With respect to SSI, the five-step evaluation process is essentially the same. See 20 C.F.R. § 416.920.

   II. Rejection of the Nurse Practitioner's RFC

   The ALJ gave weight to the opinions of state agency physicians Drs. Wong and Torre to the effect that Plaintiff could perform light work because it was consistent with the medical

---

[3] All references are to the 2004 version of the Code of Federal Regulations unless otherwise noted.

12

evidence, less weight to Dr. Damania's opinion of no exertional
limitations because Plaintiff's history of wrist pain and
sproadic joint and back pain supported exertional limitations,
and little weight to the opinion of family nurse practitioner
Linda Land that Plaintiff was so severely restricted that she was
unable to work because 1) the form was prepared for Plaintiff's
welfare case, and 2) Land was not an acceptable medical source.
(Tr. 18.)

Symptoms of the claimant alone cannot establish a physical
or mental impairment; rather, there must be evidence from an
acceptable medical source. 20 C.F.R. §§ 404.1502, 404.1513(a),
416.908, 416.913(a).

Medical sources are divided into acceptable medical sources
(licensed physicians, licensed or certified psychologists,
licensed optometrists, licensed podiatrists, and qualified
speech-language pathologists). 20 C.F.R. §§ 404.1513(a),
416.913(a). In addition, "other sources" are recognized for the
more limited purpose of showing the severity of impairments and
the ability to work. They include medical sources not previously
listed, such as nurse-practitioners, physicians' assistants,
naturopaths, chiropractors, etc.; educational personnel; public
and private social welfare agency personnel; and other
non-medical sources (for example, spouses, parents and other
caregivers, siblings, other relatives, friends, neighbors, and
clergy). 20 C.F.R. §§ 404.1513(d), 416,913(d).

A physician's assistant may be considered to be an
acceptable medical source where the assistant consults frequently
and works closely with a physician and thus acts as an agent of

the doctor in the relationship with the patient. In <u>Gomez v.</u>
<u>Chater</u>, 74 F.3d 967, 970-71 (9th Cir. 1996), the court relied on
20 C.F.R. § 416.913 regarding reports of interdisciplinary teams
and determined that a nurse practitioner who worked in
conjunction with, and under the close supervision of, a physician
could be considered an acceptable medical source, but one working
on his or her own is not an acceptable medical source.

Here, the absence of evidence of close supervision of Land
by any doctor, and indeed, the absence of probative evidence
regarding the interrelationship of Land with any other medical
professionals precludes reliance on Land's opinions as those of
an acceptable medical source. However, Land, as a physician's
assistant, was an other medical source which was appropriately
considered with respect to the severity if Plaintiff's impairment
and how it affected her ability to work.

An "other source" may be given less weight than an opinion
from acceptable medical sources. <u>Id.</u> at 971. To the extent that
Land is considered an other source or lay witness, the ALJ's
opinion reveals that the ALJ gave little weight to Land's opinion
because she was not an acceptable medical source. This is a
reason germane to her opinion and thus suffices to support
rejection. <u>Cf.</u> <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918-19 (9th Cir.
1993).

Further, the record of Plaintiff's own testimony supports
the ALJ's finding that the nurse practitioner filled out the RFC
assessment form for the welfare office. (A.R. 53.) The record
also contained other evidence that Plaintiff's physician had
agreed to write a paper so Plaintiff could get IHSS. (<u>Id.</u>)

It is appropriate for an ALJ to reject a physician's opinion where there is evidence that the physician has become an advocate for the patient's position. <u>Matney on behalf of Matney v. Sullivan</u>, 981 F.2d 1016, 1020 (9th Cir. 1992) (physician's opinion rejected because of lack of support by specific findings and physician's agreement to become an advocate); <u>Saelee v. Chater</u>, 94 F.3d 520, 522-23 (9th Cir. 1996) (concluding that an ALJ had appropriately rejected a doctor's opinion because the doctor's report was rendered solely for the purposes of the administrative hearing, varied from the doctor's own treatment notes, and was worded ambiguously in an apparent attempt to assist the claimant in obtaining social security benefits). Although in some circumstances the mere purpose for which a report is obtained is not sufficient to reject an opinion, it is appropriate to consider the additional circumstance that a report was rendered in response to solicitation by the claimant's counsel. <u>Saelee v. Chater</u>, 94 F.3d at 522-23.

Here, in light of the disparity of Land's opinion with the medical evidence of record, and further considering the Plaintiff's own testimony, one inference permissibly drawn by the administrative fact finder was that Land had taken an interest in Plaintiff's case that exceeded a strictly scientific or clinical concern and reflected some advocacy in connection with the claimant's attempt to obtain welfare. When there is conflicting medical evidence, the Commissioner must determine credibility and resolve the conflict. <u>Saelee v. Chater</u>, 94 F.3d 520, 522 (9th Cir. 1996); <u>Matney on Behalf of Matney v. Sullivan</u>, 981 F.2d 1016, 1020 (9th Cir. 1992). Further, although Land was not a

physician, this reason was sufficiently germane to the witness's opinion.

The Court thus rejects Plaintiff's contention that the reasons given for giving little weight to Land's opinion were not of sufficient force or stature or were not supported by substantial evidence.

III. <u>Rejection of Dr. Damania's Opinion</u>

In a single, footnoted sentence, Plaintiff contends that the ALJ failed to provide specific, legitimate reasons for rejecting the consulting examiner's opinion that Plaintiff's carpal tunnel would limit her to lifting ten pounds of less. (Brief at 5 n. 2.)

The ALJ recited the medical evidence of record (Tr. 16-17). The ALJ had expressly noted Damania's RFC of ten pounds or less with only occasional grasping and manipulation of small objects, (Tr. 17 ); she then reviewed the state agency consultant's RFC of light work (which by definition permits lifting of twenty pounds occasionally and ten pounds frequently) with manipulative and environmental limitations, (Tr. 17-18).

The ALJ then stated in pertinent part:

In evaluating the medical evidence, the Administrative Law Judge gives weight to the opinion of the state agency analyst that the claimant has the capacity for light work and has no psychiatric impairment. The Administrative Law Judge finds that the residual functional capacity is generally consistent with the medical evidence. The Administrative Law Judge gives less weight to the opinion of the internal medicine consultative examiner, Dr. R. Damania that the claimant has no exertional limitations. The claimant's history of wrist pain and sporadic joint and back pain supports exertional limitations.

(Tr. 18.) When viewed in context, the ALJ's evaluation is reasonably interpreted as rejecting weight limitations below

twenty pounds occasionally and ten frequently, and yet likewise rejecting an absence of any exertional limitations because of Plaintiff's pain history.

The inconsistency of an RFC with the medical evidence of record is a specific and legitimate reason for rejecting an opinion of a medical source. Greater weight will be given to opinions based on or supported by relevant evidence, such as medical signs and laboratory findings. 20 C.F.R. § 404.1527(d)(3); 20 C.F.R. § 416.927(d)(3). Likewise, the more consistent an opinion is with the record as a whole, the more weight will be given to the opinion. 20 C.F.R. § 404.1527(d)(4); 20 C.F.R. § 416.927(d)(4). It is appropriate for an ALJ to consider the absence of supporting findings in rejecting a physician's opinion. Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995); Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). A conclusional opinion that is unsubstantiated by relevant medical documentation may be rejected. See Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995).

Further, the fact that an opinion is based primarily on the patient's subjective complaints may be properly considered. Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992). The ALJ expressly concluded that the medical evidence did not support the severity of Plaintiff's subjective complaints, and inconsistencies and exaggeration diminished her

credibility (Tr. 19).[4] The ALJ's review of the medical evidence revealed that she found sparse findings supporting Plaintiff's claims of disabling hand symptoms and inability to lift, walk, sit, or stand. Further, substantial medical evidence supported those conclusions. An ALJ may reject the opinion of an examining physician and adopt the contradictory opinion of a nonexamining physician only for specific and legitimate reasons that are supported by substantial evidence in the record. Moore v. Commissioner of Social Security Administration, 278 F.3d 920, 925 (9th Cir. 2002) (quoting Lester v. Chater, 81 F.3d at 830-31). The opinion of a nontreating, nonexamining physician can amount to substantial evidence as long as it is supported by and consistent with other evidence in the record, such as the opinions of other examining and consulting physicians, which are in turn based on independent clinical findings. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

Thus, the Court concludes that the ALJ stated specific, legitimate reasons for rejecting the consultive examiner's opinion, and those reasons were supported by substantial evidence in the record.

---

[4] She set forth her analysis of the evidence at length. She noted Plaintiff's claim that she suffered constant pain, burning numbness, and tingling in her hands that caused her to drop things, could lift only one pound, walk not even two blocks, stand for ten minutes, and not sit due to fibromyalgia; she concluded that Plaintiff was not as limited as she alleged because her orthopedist opted for conservative treatment, and a condition as severe as Plaintiff claimed would have required surgery long before the hearing. Her claimed inability to write was inconsistent with her legible, handwritten completion of lengthy forms and narrations; there were no clinical findings supporting her arthritis, she twice failed to give an optimal inspiratory effort when having her chest x-rayed, her statements about her education were inconsistent, her subjective complaints of fibromyalgia were unsupported by any trigger-point findings, and it was not until February 2004 that any tests even suggested any findings consistent with carpal tunnel syndrome (Tr. 18-19).

1    IV. <u>Absence of VE Testimony</u>

2        The ALJ determined that Plaintiff was not disabled by

3    applying Rule 202.20, Appendix 2, Subpart P, Regulations No. 4.

4    (Tr. 19). Plaintiff argues that because she suffered from

5    significant nonexertional impairments, the ALJ erred in applying

6    the grids; she should have called a VE to identify specific jobs

7    within Plaintiff's RFC.

8        It is the Defendant's burden to show that Plaintiff could

9    perform other work existing in significant numbers in the

10   national economy. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th

11   Cir. 1999). Defendant may meet this burden either by obtaining

12   the opinion of the VE or by relying on the medical-vocational

13   guidelines (the Medical-Vocational Guidelines at 20 C.F.R. Pt.

14   404, Subpt. P, App. 2), which constitute administrative notice of

15   the existence of jobs for persons with specified limitations. <u>Id.</u>

16   at 1099. Generally, the functional capacity to perform a wide or

17   full range of light work represents substantial work capability

18   compatible with making a work adjustment to substantial numbers

19   of unskilled jobs and, thus, generally provides sufficient

20   occupational mobility even for severely impaired individuals who

21   are not of advanced age and have sufficient educational

22   competence for unskilled work. 20 C.F.R. Part 404, Subpart P,

23   Appendix 2, § 202.00(b).

24       When the grids are applicable, the Secretary may obtain a

25   directed conclusion of nondisability and may take administrative

26   notice that jobs exist in the national economy that a claimant

27   can perform. <u>Heckler v. Campbell</u>, 461 U.S. 458, 461-462. The

28   guidelines may only be applied when they accurately reflect a

1   claimant's limitations. <u>Desrosiers v. Secretary of Health & Human</u>

2   <u>Services</u>, 846 F.2d 573, 576-77 (9th Cir. 1988). If a

3   nonexertional limitation significantly limits the range of work

4   one can perform, mechanical application of the grids is

5   inappropriate, and a VE is required. <u>Tackett v. Apfel</u>, 180 F.3d

6   1194, 1102 (9th Cir. 1999).

7        Where nonexertional limitations are found not to

8   significantly limit a claimant's exertional capacity, then use of

9   the grids is appropriate. <u>Razey v. Heckler</u>, 785 F.2d 1426, 1430

10  (9th Cir. 1986), <u>as amended</u>, 794 F.2d 1348 (where substantial

11  evidence supported the agency's conclusion that the claimant's

12  generalized anxiety disorder did not prevent him from engaging in

13  the work that he was physically able to do, use of the grids was

14  appropriate); <u>Odle v. Heckler</u>, 707 F.2d 439, 440 (9th Cir.1983)

15  (where substantial evidence supported the finding that the

16  claimant's non-exertional impairments of deafness, dizziness, and

17  drug dependence did not significantly limit his exertional

18  capacities, use of the grids was appropriate, and no finding as

19  to specific jobs was required).

20       Here, the ALJ found that despite her nonexertional

21  impairments of no repetitive hand motions, Plaintiff could

22  perform a significant range of light work and could perform jobs

23  existing in significant numbers in the national economy. (Tr. 16,

24  20.) She further found that she could perform a broad range of

25  unskilled work. (Tr. 19). It does not appear, however, that

26  substantial evidence supports this finding.

27       In this case, the ALJ expressly found that Plaintiff's CTS

28  was a severe impairment. (Tr. 19). A severe impairment is one

that significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c).

Light work is characterized by frequent[5] lifting or carrying of objects weighing up to ten pounds, and it may involve some pushing and pulling or arm controls. 20 C.F.R. §§ 404.1567(b), 416.967(b). Many unskilled light jobs require use of arms and hands to grasp and hold and turn objects, although they generally do not require use of the fingers for fine activities to the extent required in much sedentary work. Soc. Sec. Ruling 83-10 at 5. Reaching (extending the arms and hands in any direction) and handling (seizing, holding, grasping, turning, or otherwise working primarily with the whole hand or hands) are activities required in almost all jobs; significant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do. Soc. Sec. Ruling 85-15 at 6. Fingering involves picking, pinching, or otherwise working primarily with the fingers and is needed to perform most unskilled sedentary jobs and to perform certain skilled and semiskilled jobs at all levels of exertion; as general rule, limitations of fine manual dexterity would have greater adjudicative significance in terms of relative number of jobs in which the function is required as the person's exertional RFC decreases. The loss of fine manual dexterity narrows the sedentary and light ranges of work much more than it does the heavier ranges of work. Soc. Sec. Ruling 85-15 at 6.

---

[5]"Frequent" means occurring from one-third to two-thirds of the time. Soc. Sec.Ruling 83-10 at 5. "Occasionally" means occurring from very little up to one-third of the time.

Specifically, any limitation of use of the fingers and finger tips to work with small objects may severely compromise an entire range of jobs; at all exertional levels, a person must have use of the arms and hands to grasp, hold, turn, raise, and lower objects. Soc. Sec. Ruling 83-14 at 2. Any limitation of these functional abilities must be considered very carefully to determine its impact on the size of the remaining occupational base of a person who is otherwise found functionally capable of light work. Id. at 4.

To be considered capable of performing a full or wide range of light work, one must have the ability to do substantially all of such activities. 20 C.F.R. §§ 404.1567(b), 416.967(b). Further, to be capable of a full range of work, one must be capable of performing all or substantially all occupations existing at an exertional level. Soc. Sec. Ruling 83-10 at 2. Where the effect of a limitation is unclear, then a VE is necessary. Soc. Sec. Ruling 83-14 at 6. Because varying degrees of limitations would have different effects, the assistance of a VE may be required. Id.

Here, the ALJ concluded that Plaintiff could not perform her past relevant work because, in part, it required frequent use of her hands. Despite the negative findings that the ALJ made regarding Plaintiff's credibility, the ALJ specifically found that Plaintiff could perform only jobs that required no repetitive hand motions. As stated by the ALJ, this limitation appears to be a complete prohibition of repetitive hand movements; further, it appears to include all types of hand motions. In light of the pervasiveness and importance of hand

movements in light work, and particularly because the ALJ's
limitation here is so broad and preclusive, it is reasonable to
conclude that a claimant so limited could not engage in many of
the activities required in the definition of light work and could
not perform many of the jobs in the light category. No VE was
called, so there is no evidentiary basis upon which to rest a
conclusion that Plaintiff's inability to engage in any repetitive
motions of her hands did not significantly affect either the
activities involved in light work or the number of jobs in the
category of light work.

Although the parties do not cite the Court to any factually
identical case, the instant case is analogous to Burkhart v.
Bowen, 856 F.2d 1335, 1341 (9th Cir. 1988), where the ALJ found
that the claimant had to avoid stressful environments, could not
use his hands in fine manipulation on a regular basis, and had a
vision problem. The court concluded that the non-exertional
limitations prevented use of the grids.

The Court concludes that the ALJ's finding that Plaintiff's
limitation of no repetitive hand movements did not significantly
affect the range of work she could perform was not supported by
substantial evidence. The ALJ erred in not obtaining the
testimony of an VE. Therefore, the matter will be remanded for a
hearing and for Defendant to take the testimony of a VE to
identify specific work, if any, that Plaintiff could perform at
the relevant time. Burkhart v. Bowen, 856 F.2d at 1341.

DISPOSITION

_____Accordingly, it IS ORDERED that

1. Plaintiff's social security complaint IS GRANTED IN PART,

and

        2. The matter IS REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration, consistent with this decision, of Plaintiff's status as disabled, including whether or not on the basis of the Plaintiff's age, education, work experience, and residual functional capacity she could perform any work existing in significant numbers within the economy, and including examination of a vocational expert and preparation of a decision containing all necessary findings; and

        3. Judgment BE ENTERED for Plaintiff Melanie Ruport and against Defendant Jo Anne B. Barnhart.


IT IS SO ORDERED.

**Dated:** __**March 3, 2006**__                __**/s/ Sandra M. Snyder**__
icido3                                                    UNITED STATES MAGISTRATE JUDGE